**A.F. PLAZZO, et al., Plaintiffs,**

v.

**NATIONWIDE MUTUAL INSURANCE COMPANY, et al., Defendants.**

No. C87–421–A.

United States District Court,
N.D. Ohio, E.D.

Oct. 21, 1988.

Richard Sternberg, Philip W. Murray, Matthew Fortado, Akron, Ohio, for plaintiffs.

Robert J. Drexler, Knowlton, Sanderson, Ragan, Cady Corbett & Drexler, Akron, Ohio, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SAM H. BELL, District Judge.

Plaintiffs, Anthony F. Plazzo and Plazzo Insurance Services, Inc. filed this lawsuit on February 23, 1988 alleging that defendants, Nationwide Mutual Insurance Co., Nationwide Mutual Fire Insurance Co., Nationwide Life Insurance Co., Nationwide General Insurance Co., and Nationwide Property and Casualty Co. wrongfully denied to them retirement benefits pursuant to the terms of the "Agent's Agreement," which purports to define the relationship of A.F. Plazzo to defendants, and the corporate "Agency Agreement" which defined the relationship between Plazzo Insurance Services, Inc. and defendants, in violation of the Employee Retirement Income Securi-

ty Act, (ERISA), 29 U.S.C. § 1001 *et seq.* A trial to the court was held December 9–17, 1987.

## FINDINGS OF FACT

A.F. Plazzo began his employment relationship as an insurance agent with Nationwide in April, 1966 and continued in that capacity under a series of successive Agent's Agreements, the last of which was executed by the defendants and A.F. Plazzo on January 1, 1981. On January 1, 1982, the defendants and Plazzo Insurance Services, Inc. executed a "Corporate Agency Agreement." This agreement is functionally identical to the earlier Agent's Agreements. A.F. Plazzo was the corporation's principal.

Paragraph 11 of the Agent's Agreement provides for "Agent's Security Compensation". Paragraph 11 of the Corporate Agency Agreement provides for "Agency Security Compensation."

Agent's Security Compensation involves two separate benefit programs. Under the Deferred Compensation Incentive Credit Plan, Nationwide maintained a retirement account for Plazzo and later for the agency and annually credited to that account a sum based on Plazzo's earnings from original and renewal fees for insurance policies. Under the Extended Earnings Plan, Nationwide agreed to pay Plazzo, upon his retirement, termination, death or disability, a sum equal to his earnings from renewal fees over the prior twelve months.

Both agreements at issue also provide that Nationwide's obligation to pay under either Security Compensation Plan would terminate if Plazzo competed with Nationwide within one year of the cancellation of the agent's agreement and within a twenty-five mile radius of the former business location of the agent. Plazzo's rights to payments were also forfeited if at any time following the cancellation of his agency agreement with Nationwide, he induced a Nationwide policyholder to cancel an insurance contract with Nationwide. The agreements further provided that either party had the right to cancel the agreement at any time following written notice.

Plazzo was required, pursuant to the agency agreements, to represent Nationwide companies exclusively in the sale and service of insurance to the public. He was prohibited from being licensed by any other insurance company.

Plazzo represented the Nationwide companies for over twenty years. The agency agreements provided that he was an "independent contractor" and he was paid strictly on a commission basis. The evidence adduced at trial reveals that career agents such as Mr. Plazzo, were required to attend regularly scheduled sales meetings and to meet implied quotas or face threatened cancellation of their agency agreements.

In 1983 the then current agency agreement between Plazzo Insurance Services, Inc. (with A.F. Plazzo as the corporation's principal) and Nationwide was unilaterally cancelled by Nationwide. The reasons that prompted this cancellation are relatively unimportant in view of the agreement provision which allowed either party to terminate the agreement at any time for any reason upon written notice to the other party. In any event, the cancellation was not a breach of the agreement.

In 1984 Plazzo received information from Nationwide that any payments owing him under the Agency Security Compensation programs were considered forfeited by Nationwide since Plazzo had allegedly competed with Nationwide in violation of the Agreement.[1] Plazzo had constructive notice of defendants' failure to pay benefits, when within sixty days following termination of the agency agreement as pursuant to agreement, no payments were made.

## CONCLUSIONS OF LAW

■ The defendants argue that the plaintiffs' action is barred for failure to timely file. Defendants correctly point out that ERISA provides no explicit limitation period for bringing a private cause of action. In such circumstances, the federal courts look to state law for an analogous limitation provision to apply. *See Wilson v. Garcia,* 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). The case under review involves benefit plan participants who are seeking those amounts allegedly owed them under the plan. The issue in this case is analogous, therefore, to a breach of contract action. *Jenkins v. Local 705 International Brotherhood of Teamsters Pension Plan,* 713 F.2d 247 (7th Cir.1983). The limitation period for contract actions under Ohio law is 15 years. Ohio Revised Code § 2305.06.

However, the defendants argue that the parties defined their own statute of limitations, specifically in paragraph 20 of the Corporate Agency Agreement which provides as follows:

Legal Action Under This Agreement. It is agreed that no action, suit, proceeding at law or in equity shall be brought under this contract unless it is commenced and process is served within three years after the cause of action for which this suit is brought.

While this provision is not a model of artful drafting, it is not so ambiguous as to render it meaningless, as the plaintiffs argue.

Defendants assert that contract provisions such as the above-quoted provision, modify the law of this State as to limitation periods. Defendants refer the court to *Globe American Casualty Co. v. Goodman,* 41 Ohio App.2d 231, 325 N.E.2d 257 (Cuy.Cty.1974), for the proposition that parties may modify the statutory time for bringing an action on an insurance contract provided the shorter period is reasonable. However, the *Globe* case and others cited to this court by the defendants do not stand for the proposition that parties have the absolute right to vary a statutory peri-

---

**1.** There is a factual question as to whether Plazzo, either as an individual or as agency principal, competed in violation of the agreement. The weight of the evidence tends to indicate that A.F. Plazzo was in compliance with the terms of the forfeiture clause. The plaintiff made a motion to have the pleadings conform with the evidence, but failed to submit an amended pleading apprising the court of any additional causes of action. Therefore, this court is limited to the ERISA claims raised in the complaint and will not address the issue of whether or not defendants breached the agreement by failing to pay plaintiffs pension benefits due at termination.

od of limitations by contract. Rather, if the parties to a contract for insurance attempt to do so, the courts will examine the totality of the circumstances on a case by case basis to determine the reasonableness of the modification. Unlike the cases which have been cited to the court, the contract at issue is not an insurance contract nor are the plaintiffs insureds seeking to recover under an insurance policy. Rather, the instant fact situation involves an agreement defining the relationship of an exclusive agent to the insurance company whom he contracts to represent. Additionally, this is not a breach of contract action by an insured but rather an action by participants in a benefit plan to enforce their rights pursuant to a federal statute, *i.e.*, ERISA, 29 U.S.C. § 1001, *et seq.* Thus, the cases cited by defendants are factually and legally distinguishable from the matter under review.

The court concludes that the fifteen year statute of limitations, found in Ohio Revised Code § 2305.06 is the limitations period applicable to this matter. The court further concludes, however, that this limitations period has not been modified by the contractual provision found at paragraph 20 of the Agent's Agreement. The complaint raises no state cause of action. Those state courts which have addressed the issue of whether parties may modify a state statute of limitations by a mutually agreed upon contract provision did not reach their conclusions with national interests in mind. It is the duty of the federal courts to assure that the importation of state law will not interfere with or frustrate the implementation of national policies. *Occidental Life Insurance Co. v. EEOC*, 432 U.S. 355, 367, 97 S.Ct. 2447, 2455, 53 L.Ed.2d 402 (1977), *quoting Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 465, 95 S.Ct. 1716, 1722, 44 L.Ed. 2d 295 (1965).

Accordingly, the court holds that O.R.C. § 2305.06 cannot be modified by the parties to a contract to limit the statutory period for the purposes of an ERISA action absent the existence of a state statutory provision allowing such a contractual modification. Ohio law provides none. An ERISA action is a federal cause of action and while most analogous to a state breach of contract claim, it is distinct from such a cause of action in both its purposes and its source. The court cannot extend the force of Ohio caselaw, which discusses and resolves a state cause of action and distinguishable fact patterns to an ERISA cause of action in federal district court. Therefore the court concludes that counts one and two of the complaint which seek recovery of benefits owed have been timely brought.

■ Count three of the plaintiffs' complaint alleges a violation of 29 U.S.C. § 1104(a)(1) of ERISA in that defendants, fiduciaries as defined under the Act, failed to discharge their fiduciary duties by failing to act solely in the interest of the participants of the plan by failing to pay those benefits owed under the plan. This claim is governed by the limitation of actions provisions of 29 U.S.C. § 1113 which provides a three year statute of limitations with respect to a fiduciary's breach of any responsibility, duty or other obligation. Plaintiffs had constructive knowledge of any fiduciary duty on February 1, 1984, the date upon which the contract at issue specified for the payment of benefits, *i.e.*, sixty days following a qualified termination. Plaintiffs did not file suit under 29 U.S.C. § 1104 until February 23, 1987, more than three years from the date they had constructive knowledge of the alleged breach of fiduciary duty. Accordingly, count three of the complaint was not timely brought and is hereby dismissed. Count three will not be addressed in the following findings of fact and conclusion of law.

The defendants also have preserved their affirmative defense of *res judicata.* For an understanding of this argument, a brief recitation of the history of this and a related state action is necessary.

The case under review was filed on February 23, 1987 in federal district court. The plaintiffs, A.F. Plazzo and Plazzo Insurance Services, Inc. therein seek the amounts allegedly due them under certain benefit plans alleging that the defendants,

Nationwide Mutual Insurance Co., Nationwide Mutual Fire Insurance Co., Nationwide Life Insurance Company, Nationwide General Insurance Co., and Nationwide Property & Casualty Co., ("Nationwide") violated certain provisions of ERISA, 29 U.S.C. § 1001 *et seq.* when they denied plaintiffs' rights under the benefit plans at issue.

On October 19, 1983, plaintiffs, A.F. Plazzo and Robert Plazzo had earlier filed suit in the Court of Common Pleas, Summit County, Ohio against the same defendants. The state court complaint sounded in breach of contract and the first amended complaint contained a count alleging that the plaintiffs were entitled to an as yet undetermined amount for retirement and pension benefits. That count was dismissed without prejudice.

Common Pleas Judge Frank J. Bayer ultimately granted summary judgment to Nationwide on all remaining counts of plaintiffs' second amended complaint. The Ninth District Court of Appeals affirmed, and the Ohio Supreme Court refused to review the case.

Defendants argue that the final judgment of the state court bars the present action relying on the doctrine of *res judicata.* They assert that *res judicata* obtains where, comparing the two suits, there is an identity of parties and an identity of facts in dispute. The parties in the present suit are undisputedly identical, thus the issue for resolution is whether there is an identity of facts in dispute or in other words, were the claims or causes of action in the first action the same as in the present one?

To support their arguments of *res judicata* the defendants rely on the recently overruled case of *International Union, United Aerospace and Agricultural Implement Workers of America, UAW v. Cleveland Gear Corp.,* 644 F.Supp. 241 (N.D.Ohio 1986). In *Cleveland Gear,* the union originally brought suit in 1983 against the defendant company under the Labor Management Relations Act alleging that Cleveland Gear's reduction of health and life insurance benefits violated the collective bargaining and insurance agreements between the Union and Cleveland Gear. The district court rejected that argument and the Sixth Circuit affirmed, stating that the "decision is without prejudice to any action based on a theory of recovery other than the two contracts at issue."

The Union filed a second action on February 5, 1986 alleging violations of ERISA, 29 U.S.C. § 1001 *et seq.,* negligent infliction of emotional distress, and detrimental reliance. In response to a motion for summary judgment by Cleveland Gear, the district court ruled that the 1986 action was barred under the doctrine of *res judicata,* since the 1986 claims and the 1983 claims were ultimately founded upon the collective bargaining and insurance agreements. On appeal to the Sixth Circuit, the district court's order granting summary judgment in favor of Cleveland Gear was overruled. The appeals court noted that count three of the 1986 complaint could be interpreted as raising a claim of promissory estoppel based on promises made by Cleveland Gear and Eaton and that this claim raised issues, questions of fact, and legal determinations not yet addressed by any court. Accordingly, the Circuit Court, finding that the Union's 1986 complaint was based, in part, on a different set of legal terms and operative facts than the 1983 complaint, concluded that the entire action, including the ERISA claims, were not barred by the doctrine of *res judicata.* Thus, it is unclear if reliance on *Cleveland Gear* is determinative of the issues presented here.

■ The court notes, however, that it is settled law that the judgment of a prior suit, if rendered on the merits, is *res judicata* between the same parties on the same claim or cause of action and operates as an absolute bar not only to every ground of recovery or defense actually presented in the prior action but also to every ground which might have been presented. Indeed, the doctrine of *res judicata* precludes a plaintiff from splitting his cause of action so as to make it several actions with respect to claims then capable of recovery in the first action. If an action is brought for a part of a claim, a judgment obtained in

the action precludes the plaintiff from bringing a second action from the residue of the claim. In other words, if the second suit is based on the same cause of action, the judgment upon the merits in the first case is an absolute bar to the subsequent suit, not only in respect to every matter offered and received to sustain the demand, but also as to every ground of recovery which might have been presented. However, the conclusive effect of a judgment on the merits as *res judicata* is limited to the same cause of action; it does not operate to bar an action on a different cause of action. *Cemer v. Marathon Oil Co.*, 583 F.2d 830 (6th Cir.1978).

Various tests for defining a cause of action have been advanced by different courts and commentators. A variation of the following test is commonly used to make the determination.

—Whether the factual basis of both claims is the same.

—Whether the essential facts and issues have been similarly presented in both cases.

—Whether the evidence will suffice to sustain both verdicts.

—Whether the same right is infringed by the same wrong.

—Whether the wrong for which redress is sought is the same in both actions.

—Whether the two actions are so similar that a different judgment in the second would destroy or impair rights or interests established by the first.

■ Addressing the various factors in the order presented above, it is evident that the grounds for recovery in the first action were breach of the Agent's Agreement for terminating plaintiffs unlawfully. Plaintiffs sought damages for the consequences of that breach in state court. The grounds for relief in the second action, *i.e.* the instant action, are the failure of defendants to abide by the terms of the Agent's Agreement in relation to post termination benefits. Both grounds are quite similar in that they involve a breach of the Agent's Agreement, but subtly different in that a termination under the terms of the agreement triggered the obligation to pay the benefits provided for in the agreement. In other words, the plaintiffs have alleged two successive and discrete breaches of the same agreement. The first alleged breach was adjudged lawful under the contract, but that conclusion does not preclude the illegality of the second alleged breach. Therefore, the basis of the actions, while indeed similar, are not identical.

Further, the factual basis of each lawsuit, while again quite similar and overlapping, is not the same. Whether the termination of plaintiffs as agents was a breach under the agreement involved only an examination of the agreement, while a determination of whether the plaintiffs have been unlawfully denied post termination benefits requires an examination of the agreement and an inquiry into the parties post termination conduct, *inter alia,* the plaintiffs' compliance with the post termination competition requirements included in the Agreement. Thus it is clear that those issues and facts necessary to resolve the question of whether or not plaintiffs were wrongfully denied post termination benefits were not presented to the state court in the first action. The determination that there had been a breach of the agreement when defendants terminated the Agent's Agreement depended upon a review of the agreement, no post termination facts or issues were addressed. Therefore, the evidence to sustain a second verdict was not before the common pleas court when it ruled on the lawfulness of the termination.

Additionally, the right to uninterrupted employment or agency is not identical to the right to receive benefits upon termination of an employment or agency agreement. Indeed, the alleged wrong addressed in the state action was the defendants' termination of the Agent's Agreement while the wrong alleged in the instant action is the defendants failure to pay termination benefits upon that termination. Finally, the two actions are not so similar that a different judgment in this action would destroy or impair rights or interests established by the first. The state court's

conclusion that the defendants had the right under the agent's agreement to terminate their agency relationship with plaintiffs will not be affected by a resolution of whether or not plaintiffs are entitled to the post termination benefits provided for in the agreement. Accordingly, the court concludes that the Summit County action does not bar the bringing of the present suit.

▪ Additionally, defendants allege that ERISA limits the definition of an employee to an "individual." 29 U.S.C. § 1002(6). They further argue that a corporation is not an "individual" for purposes of ERISA. They thus conclude that since it was a corporation, Plazzo Insurance Services, Inc., which contracted to provide services to Nationwide, and not Anthony Plazzo, an individual, that there was no "employee" who can state a cause of action under ERISA. Defendants cite no authority for this contention.

The court has reviewed the statutory definitions at issue and concludes that defendants restrictive interpretation of the statute does not comport with the spirit or the language of ERISA. Thus, while § 1002(6) defines an "employee" as any "individual" employed by an employer, § 1002(9) defines the term "person" as any *individual,* partnership, joint venture, *corporation,* mutual company, joint stock company, trust, estate, unincorporated organization, association, or employee organization. Thus the words "individual" and "corporation" are found in the statute as alternative definitions of the term "person". Accordingly, the court concludes that the fact that A.F. Plazzo attempted to incorporate his insurance agency and as such contracted to represent Nationwide for the final year of their association does not preclude the bringing of suit under the provisions of ERISA. It is undisputed that A.F. Plazzo was considered the agency's "principal" and as such it was his earnings upon which the benefits at issue were calculated.

The next issue the court must address is whether A.F. Plazzo and his agency were "employees" of Nationwide within the meaning of 29 U.S.C. § 1002(6) with re-

spect to the Agency Security Compensation plan. It is undisputed that plaintiffs are denominated "independent contractors" in the agency agreements. This denomination, while significant, is not controlling. Plaintiffs introduced evidence which indicates that many such "independent contractors", including A.F. Plazzo, consider themselves "captive agents" with little control over the most important aspects of the agency relationship. This evidence, too, while probative, is not controlling.

Defendants argue that the court should adopt the test set forth in *Holt v. Winisinger,* 811 F.2d 1532 (D.C.Cir.1987), to determine whether plaintiffs are "employees" as contemplated by the Act. That test is essentially the classic common law test which was developed to define the distinctions between an independent contractor and an employee in order to determine whether vicarious liability would obtain in an employment relationship.

While the *Holt* opinion is of instructional interest, it cannot be seen as affording the only tool to be utilized in crafting an opinion on this subject. It is thus appropriate to consider and discuss other views rendered in the same or similar contexts which assist in casting light on the question raised.

It is well to begin by defining the scope of the subject. What acts or conditions denominate an "employee" as distinguished from an "independent contractor?" The precedential definition of the word employee is richly imbedded in the common law. The term employee as it is used and defined in the ERISA statute itself means "any individual employed by an employer." (29 U.S.C. § 1002(2)(D)(6)). While the legislative branch gives us small assistance by way of further definition, the Department of Labor has interpreted the word in question broadly, it is claimed, by reason of the expressed intent of the Congress in enacting ERISA. It was the enunciated concern of Congress that "many employees with long years of employment [were] losing anticipated retirement benefits owing to the lack of vesting provision in such plans." 29 U.S.C. § 1001(a).

The legislative history of ERISA expressly provides that Congress intended that the Act be applied broadly:

> Generally, it would appear that the wider and more comprehensive the coverage, vesting, and finding, the more desireable it is from the standpoint of national policy. One of the major objections of the new legislation is to extend coverage under retirement plans more widely. H.R. Rep. # 93–807, 93 Cong., 2d Session (1974).

Feeling justified in so doing, the Department of Labor proceeded to interpret the word "employee" as used in the context of ERISA broadly.

> It is our interpretation that insurance agents whose business activity is predominately with one life insurance company are "employees" of that life insurance company within the definition set forth in § 3(6) ... Where there exists a potential for abuse under an employee benefit plan, the Department intends to interpret the provisions of ERISA liberally in favor of plan participants and their beneficiaries, in order to protect their rights and benefits under the plan. For this reason, the definition of "employee" as set forth in § 3(6) of ERISA is interpreted broadly to include certain insurance agents who under common-law rules would not be deemed to be "employees". Congress has expressed its intent for broad interpretation of the coverage of ERISA to protect the interests of participants and their beneficiaries. Evidence of this intent is reflected by section 4(a) of ERISA which extends the jurisdiction of Title I provisions to participants of all employee benefit plans except those handfuls mentioned in section 4(b) (and those plans exempted from certain parts of Title I pursuant to sections 201, 301, and 401 of ERISA).

Department of Labor Opinion Letter 77–75 (September 21, 1977).

■ Were it the task of the Department to affix a legal definition of various terms in the law, our consideration of the present question would need proceed no further. But while an executive agency is empowered to interpret those statutes it has a duty to enforce, this court is not bound by that interpretation. Rather, it is the judiciary which has the ultimate duty to interpret and enunciate the law after giving deference to administrative interpretations. However, here there is no reason to afford special deference to the Department in the area under discussion:

> We also note the admonition of Justice Reed that the determination of independent contractor status from litigated facts is not a "specialized field of knowledge" to the extent that the Labor Board "carries the authority of an expertness which courts do not possess and therefore must respect...."

*Radio Officers v. Labor Board,* 347 U.S. 17, 50, 74 S.Ct. 323, 341, 98 L.Ed. 455, 482 (1954), as quoted in, *Local 777, Democratic U. Organizing Com. v. NLRB,* 603 F.2d 862, 907 (1978). It is, therefore, this court's duty to establish the definition of the term "employee."

The breadth of Agency's definition has had its impact on a number of recent decisions which have been cited by the parties. In *Darden v. Nationwide Mut. Ins. Co.,* 796 F.2d 701 (4th Cir.1986), the Fourth Circuit found that the common law definition of the word employee is not broad enough to do justice to the "policy and purposes" of the Act. Thus, the court stated, in keeping with Supreme Court decisions in *United States. v. Silk,* 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1954) and *NLRB v. Hearst,* 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944), that the definition of the word employee should be "tailored" to the facts, given the broad nature of the statute. A primary consideration was posed: does the inclusion of a disputed category of persons effectuate the "declared policy" of the statute? In keeping with this view the *Darden* court indicated two general tests to be applied to the facts so as to arrive at the definition required.

The *Darden* opinion appears to have had considerable impact on Judge Graham's thoughtful views set forth in *Wolcott v. Nationwide,* 664 F.Supp. 1533 (S.D.Oh. 1987). In *Wolcott* while no clear declara-

tion was made concerning whether the common law definition or one of more breadth would be applied, at least lip service was given to the former as set forth in Restatement of Agency while further discussion centered around the *Darden* elements.

A fundamental dichotomy emerges at this point. All who have considered this question agree that employees—as opposed to independent contractors—are covered parties under ERISA. But some believe that the class—employees—is one defineable strictly by common law definition, while others rule that the common law definition is inadequate because it may, if applied, preclude admission of broad groups of people who, though they do not meet the classic definition of employee, deserve inclusion because their circumstances warrant and because Congress intended a broad and nonrestrictive definition of the word employee. *Darden* and its progeny suggest that the stated intent of the Congress and the Department of Labor is to include all persons whose inclusion would serve to effectuate the "declared policy and purposes" of ERISA. This being so, the common law definition of the term employee alone is too narrow. A rationale for this view is found in *Hearst* wherein the Supreme Court opined that the word employee was to be interpreted "in the light of the mischief to be corrected and the end to be attained."

It is clear that the *Darden* court sought a result which squared a legal definition of the word employee with some broader meaning in the court's attempt to define the term consistent with what it believed was the intent of Congress when it enacted the statute. As indicated previously, the statutory definition of the word is a sparse one and gives no hint whatever that some more expansive and global meaning is intended.

Clearly, it is the purpose of the act to provide broad coverage for those entitled to that protection. The *Darden* opinion suggests, at 706:

In interpreting statutory language so as to define a class of persons protected by the statute, a court must take as its 'primary consideration' whether the inclusion of a disputed category of persons would effectuate the 'declared policy and purposes' of the statute. *Silk*, 331 U.S. at 713 [67 S.Ct. at 1468] ... *Hearst*, 322 U.S. at 131–33 [64 S.Ct. at 860–61].

As thereafter indicated, *Darden, supra,* correctly notes that the purposes of ERISA are exactingly set out in § 2 of 29 U.S.C. § 1001. Congress was concerned that "many employees with long years of employment are losing anticipated retirement benefits."

But what class is to be protected? The statute speaks clearly that *employees* are to be protected. That word and the class are clear and ask for no result oriented definition to strain their meanings to include a more expansive definition.

It is not the court's task to change, amend, or broaden the meaning of the term to include any given member; but, rather, the court must look to legal precedents to define that word and assess the facts to determine the plaintiffs' claim to membership in a protected class. Here, the question is: do the facts, the circumstances surrounding the relationship existing between Plazzo and Nationwide, suggest that he was an employee of Nationwide and thus entitled to the benefits of ERISA?

Both the *Darden* opinion and by inclusion the *Wolcott* opinion give emphasis to the decisions of the Supreme Court in both *U.S. v. Silk, supra* and *NLRB v. Hearst, supra.* The court first held that the word "employee" as used in the context of Social Security legislation could not be defined by the standard of the common law. The court held in similar fashion, when defining the word in the context of the National Labor Relations Act. In other words, the court held that the intent of Congress, in enacting the two portions of legislation referred to intended that the word "employee" be given a broader meaning than it was afforded traditionally in view of the Congress' intent to include within ERISA's protections all those who could fit into the perimeter of the protected class.

But if we, as did the *Darden, supra,* court, give great emphasis to the *Hearst,*

*supra,* and *Silk, supra,* view concerning the obviousness of Congressional intent, we must then go one step further. For subsequent history teaches that the intent of Congress as determined by the court was not the intent of Congress at all. Subsequent to the 1974 *Silk* decision, Congress passed a joint resolution (62 Stat. 438 (1948)), referred to as the "Status'Quo Resolution" or "Gearhart Resolution", the purpose of which was to disapprove the administrative agency's proposed regulations based upon the *Silk* decision and reiterated Congress' intention that the employee status should be determined by the traditional legal tests. The Hearst decision was assailed as well. Two quotations are of interest here, both from *Local 777, Democratic U. Organing Com. v. NLRB,* 603 F.2d 862 at 908 (1978):

> Senator Taft, one of the principal contributors and advocates of the legislation, in remarks summarizing the principal differences between the Conference Agreement on H.R. 3020 and the Bill which the Senate passed, stated:
>
> > The legal effect of the amendment [exempting "independent contractors"] therefore is merely to make it clear that the question whether or not a person is an employee is always a *question of law,* since the term is not meant to embrace persons outside that category under the general principles of law of agency.
>
> 93 Cong.Rec. 6441–6442 (emphasis added).
>
> In *NLRB v. United Insurance Co.,* 390 U.S. 254, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968), Justice Black outlined very clearly what it was that the Court had earlier attempted in *Hearst,* and Congress's response to that effort:
>
> > Initially this Court held in *NLRB v. Hearst Publications,* 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170, that "Whether ... the term 'employee' includes [particular] workers ... must be answered primarily from the history, terms and purposes of the legislation." 322 U.S., at 124, 64 S.Ct. 851 [at 857]. *Thus the standard was one of economic and policy considerations within the labor field.* Congressional reaction to this construction of the Act was adverse and Congress passed an amendment specifically excluding "any individual having the status of an independent contractor" from the definition of "employee" contained in § 2(3) of the Act. *The obvious purpose of this amendment was to have the Board and the courts apply general agency principles in distinguishing betwen employees and independent contractors under the Act.* And both petitioners and respondents agree that the proper standard here is the law of agency. Thus there is no doubt that we should apply the common-law agency test here in distinguishing an employee from an independent contractor.

390 U.S. at 256, 88 S.Ct. at 989–999 (emphasis added) (footnote omitted).

One final note should be added. In *Allied Chemical & Alkali Workers v. PPG Co.,* 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971), the question addressed was whether retired employees were considered employees under collective bargaining agreements relating to health care benefits. Justice Brennan observed concerning the findings of the Board below:

> We recognize that "classification of bargaining subject as 'terms and conditions of employment' is a matter concerning which the Board has special expertise" (citation omitted). *"The Boards holding in this cause however depends on the application of law to facts and the legal standard to be applied is ultimately for the courts to decide and enforce ..."*

(Emphasis added.) *Id.* at 182, 92 S.Ct. at 399.

In sum, it would seem clear that although *Silk, supra,* and surely *Hearst, supra,* held to the contrary, the intent of the Congress in each instance was to give common law meaning to the word employee. It is further true that in those instances, no artificial meaning gleaned from economic "reality" or social motivation displaced the long standing common law definition of the term in question.

The court is of the opinion first, that no need or justification is shown here to suggest that any meaning other than a common law definition was intended by Congress. Second, to the degree that *Darden, supra,* and thereafter *Wolcott, supra,* find *Hearst, supra,* and *Silk, supra,* as predicates for their validity, such reliance is misplaced.

■ In sum, this court is of the opinion—and so rules—that the meaning of the words "independent contractor" and "employee" are those given by the precepts of the common law. The common law factors include:

1. The nature and degree of control retained by the employer.

2. The degree of supervision retained by the employer over the details of the work.

3. The extent to which services are an integral part of the employer's business or a distinct business.

4. The duration of the relationship.

5. Who supplies the place or instrumentalities of work.

6. The method of payment.

7. The employee's opportunity for loss or profit.

8. The amount of initiative, skill, judgment or foresight required of the employee for the success of the enterprise.

9. The right to discharge.

10. Whether the employee is engaged in a business apart from the business of the employer.

11. Whether an employee can hire and control its own employees.

12. Whether the employer withholds taxes or pays social security for the employee.

*See Restatement (Second) of Agency* § 220 (1958).

■ The first common law factor cannot be weighed overwhelmingly on the side of independent contractor or employee status, however, the court concludes that the evidence adduced at trial favors the conclusion that Plazzo was an employee for the purposes of this factor. That evidence revealed that although a career agent such as A.F. Plazzo had a great deal of freedom to arrange his business affairs, that freedom was severely circumscribed in several particulars. Mr. Plazzo was required to represent only Nationwide and no other insurance company (without the express permission of Nationwide). He labored under what witnesses described as an "implied quota." In fact, Robert Plazzo, the plaintiff's son, testified that while he served Nationwide as a district manager, he was required to warn agents whose sales were lagging of possible termination if their sales did not increase and to suggest resignation to such offenders. Additionally, witnesses, who either were or are currently Nationwide agents, testified that their attendance at sales meetings was mandatory in practice. There was further testimony that agents were often restricted as to how much of a certain variety of insurance they could sell. Finally, and perhaps most importantly, agents had no control over the terms of their agency agreements. There was no negotiation of terms, agents were required to accept the terms wholesale in order to commence or continue their association with Nationwide. On the other hand, Mr. Plazzo was free to chose his own hours, his own office, and his own employees.

The second factor seems to militate towards independent contractor status. This determination, however, depends upon the definition afforded "details". It appears that Mr. Plazzo was free to define his own business relationships with his employees and his clients. He could chose whom to hire and whom to contact. The details of who, what, when and where of conducting his sales business were completely within Mr. Plazzo's control. But, if "details" is defined as the minutia involved in insurance contracts, these details were the sole perogative of Nationwide.

The third factor suggests an employee relationship. Service is clearly an integral part of both Nationwide and Mr. Plazzo's business; both were in business to sell insurance and to service those accounts.

The business of Nationwide and the business of Mr. Plazzo were not distinct from one another.

The fourth factor again suggests an employee relationship. Mr. Plazzo represented Nationwide exclusively for over twenty years.

The fifth factor indicates an independent contractor status. Clearly the place of business was supplied by A.F. Plazzo who built his own building, to his own (or his son's) specifications to house his Nationwide insurance agency. The furnishings, office equipment, etc. were also supplied by A.F. Plazzo. However, the computer which linked Nationwide with the Plazzo Agency was the property of Nationwide.

Mr. Plazzo was paid solely on commission although there was undisputed testimony that "orphan" policies, *i.e.*, policies without an agent, which were income producing were distributed as they became "orphaned" according to a incomprehensible or perhaps *ad hoc* company policy. There was testimony that some found homes as the result of contests, some went to new and struggling agents, while others were randomly distributed. Because of this, while career agents were generally paid on a commission basis, they could become the beneficiary of income if they were awarded orphan policies. Thus, some part of an agent's income could come from sources other than their own initiative and resourcefulness. But on the whole, an agent's initiative, skill, and judgment were the mainstays of his (her) income.

Either party to the agency agreement could terminate it at any time. This factor is equivocal. It is not unlike a terminable-at-will employment relationship. And, as is often the case in an employment relationship, the hardships of termination are suffered more acutely by the discharged agent than the company. While Nationwide perhaps loses a talented agent, the agent cannot take the policies with him (her), these are the property of Nationwide. If the agent's termination is "unqualified" he not only loses his livelihood but his retirement benefits as well.

Nationwide and A.F. Plazzo were engaged in the same business. Nationwide is in the business of selling and servicing insurance policies, so was Mr. Plazzo. Mr. Plazzo was able to hire and control his own employees, which usually involved office help. Mr. Plazzo withheld taxes and paid social security for his employees.

Thus, the relationship between Nationwide and Plazzo was certainly not a classic independent contractor relationship, nor was it a classic employer/employee relationship. However, a review of the common law factors indicates that Mr. Plazzo's status was more akin to that of an employee than that of an independent contractor. The control exerted over him by Nationwide was much more pervasive and of greater duration than that control exerted over a classic independent contractor.

After weighing and assessing all of the above factors, both common law and *Darden*, this court concludes that A.F. Plazzo was a member of the class of people which Congress sought to protect in enacting ERISA and was an employee of Nationwide for purposes of the Act.

■ Next, the court must resolve the issue of whether the Agent's Security Compensation Plan is an employee pension plan under ERISA. An employee pension benefit plan is defined in 29 U.S.C. § 1002(2)(A), as "... any plan, fund, or program which was heretofore or is hereafter established by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result or surrounding circumstances such plan, fund or program—(i) provides retirement income to employees, or (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond."

The Agent's Security Compensation Plan includes two benefit programs, deferred compensation incentive credits and extended earnings. The Agency Agreements provide that both programs are forfeited by the agent if he (or the agency's principal) ... induced or attempted to induce, either directly or indirectly, policyholders

to lapse, cancel, or replace any insurance contract in force with Nationwide.

.　.　.　.　.

either directly or indirectly, by and for himself or as an agent, solicitor, representative or broker in any way be connected with the fire, casualty, health, or life insurance business within one year following cancellation within a twenty-five (25) mile radius of Agency's business location at the time of cancellation ...

Exhibit B at 5.

The deferred compensation plan is financed through contributions made by Nationwide on the agent's behalf to a group annuity. The amount of contribution for an agent is calculated based upon a percentage of the sales and renewal fees earned by the agent. Contributions to an agent's account begin when the agent has completed five years of service and continue until he/she is terminated for any reason including, but not limited to, retirement, death, or disability as long as he/she has reached age sixty. A plan participant may elect to receive early reduced deferred compensation benefits at any time upon or after reaching the age of fifty and is entitled to one hundred percent of the accrued benefits if payments begin at age sixty. Benefits are paid over a period of three to ten years or as a life annuity.

In view of the benefit accrual and distribution features of the Deferred Compensation Plan, the court concludes that it provides retirement income to employees and is an employee pension benefit plan under ERISA.

■ The Extended Earnings Plan establishes a benefit whereby an agent with at least five years service who is terminated upon retirement, death or disability, or qualified cancellation for other reason, is entitled to a sum equal to the renewal services fees paid to the agent by Nationwide for the last twelve calendar months immediately preceding the cancellation of the agreement. The benefit is payable beginning sixty days following the termination of the agency agreement, and the payments are made over a period of three to ten years or as a life annuity depending upon the method of payment elected by the agent. The benefit is financed by decreasing for a two year period the renewal commission rates of the agent who takes over the files of the departing agents. Payments are not dependent upon the agent attaining an age certain, but are distributed only upon termination of service. The Extended Earnings Plan is not an immediate termination bonus but results in deferring a portion of the agent's income for distribution over an extended period beyond his termination. This plan, too, includes the indicia of a pension benefit plan under ERISA, 29 U.S.C. § 1002(2).

The defendants rely on the Fourth Circuit opinion in *Fraver v. North Carolina Farm Bureau Mutual Insurance Company*, 801 F.2d 675 (4th Cir.1986), *cert. denied*, 480 U.S. 919, 107 S.Ct. 1375, 94 L.Ed.2d 690 (1987), for the proposition that the Extended Earnings Plan represents a "buy out" provision in the agent's agreement whereby the post-termination benefits are calculated on the basis of an agent's commissions for the prior year and, in that respect, are like a final commission, paid over an extended period. The *Fraver* court concluded that such benefits are in the nature of a buy out in which the departing agent receives payments based upon what he leaves behind in the way of business for his successor. The court further reasoned that if the departing agent goes into competition with his successor, he is destroying the resource that would be used to pay him.

However, the evidence introduced at trial revealed that a Nationwide agent had no exclusive right to customer accounts which he could sell, hence no exclusive rights to clients which could be bought out. Any accounts or policy holders which A.F. Plazzo serviced were accounts or policy holders of Nationwide. These were Nationwide accounts and following termination a former Nationwide agent has no proprietary interests in those accounts. They become "orphan policies" and are distributed to the agents of Nationwide's choice. The departing agent has no control over the distribution of his former accounts.

Accordingly, the court concludes that the Extended Earnings Plan is not in the na-

ture of a "buy out," but is a pension benefit plan. The legislative history of ERISA supports this conclusion:

> [I]n order to protect plan participants and beneficiaries against an erosion of ERISA's standards, supplemental retirement income payments or a severance pay arrangement, a principal effect of which is the evasion of the standards or purpose of title I of ERISA is treated under the bill as a pension plan rather than a welfare plan. Thus, it [a severance pay arrangement] is subject to the ERISA standards.

*See* Senate Committee Reports, P.L. 96–364, cited in CCH Pension Plan Guide, pg. 14, 130 at 18, 109–5, 18, 110.

 Finally, the defendants argue that even if the Agent's Security Compensation plans are found to be pension plans under ERISA the non-forfeiture provision of § 1053(a) does not apply to the plan by virtue of 29 U.S.C. § 1051(2), which provides that the vesting requirements do not apply to a plan which is unfunded *and* is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees. Evidence was heard as to whether the plan is funded or unfunded. Nationwide has made various statements as to the funding status of the plans. This, however, is not conclusive in view of the court's finding that the agents are not a select group of highly compensated individuals within the meaning of § 1051(2). *See Wolcott, supra* at 1539. There is no clear standard for determining an exempt class of "highly compensated employees" for purposes of this exemption. However, in the context of qualification of benefit plans under the federal tax law, Congress has defined "highly compensated employee" to encompass a small group of officers, upper level management and generally employees earning compensation in the top 20% of all employees. *See* 26 U.S.C. § 414(q)(1)–(5).

The evidence revealed that there are approximately 5,000 to 6,000 Nationwide agents. These agents are not considered upper management and they do not represent a small number of officers. The evidence further revealed that while some of these agents may be "highly compensated" there was evidence to suggest that others were not. The evidence revealed that some agents struggle to make "implied quotas" and may be requested to resign. The evidence further showed that the compensation earned by agents was dependent upon their own initiative, judgment and skill and sometimes the receipt of orphan policies. Therefore, it stands to reason that highly motivated agents, such as A.F. Plazzo, were often well compensated while less motivated agents were less well compensated. These are not indicia of a consistently highly compensated select group of individuals. Accordingly, the court finds that the Agent's Security Compensation Plans are subject to the nonforfeiture provisions of § 1053(a), which provides that "each pension plan shall provide that an employee's right to his normal retirement benefit is nonforfeitable upon attainment of normal retirement age ...".

 The term "normal retirement age" means the earlier of (1) the time designated in the plan as the normal retirement age, or (2) the later of age sixty-five or the tenth anniversary of the participant's participation in the plan. 29 U.S.C. § 1002(24). The term "normal retirement benefit" means the greater of the early retirement benefit under the plan or the benefit under the plan commencing at normal retirement age. While no age is expressly designated in the plan as "normal retirement age" the plan does provide that an agent at age sixty receives 100% of the accrued benefit. Thus, the court concludes that age sixty is the "normal retirement age" designated in the plan. In other words, since the Nationwide plan specifically provides for payment of 100% of the accrued benefit at age sixty payable upon termination, age sixty is the "normal retirement age". Mr. Plazzo is presently past sixty years of age and is therefore entitled to enforce payment of his pension benefits.

IT IS SO ORDERED.