99 F.3d 307
 96 Cal. Daily Op. Serv. 7895, 96 Daily Journal
D.A.R. 13,071,
Pens. Plan Guide P 23928I
William DUGGAN, Plaintiff-Appellant,
v.
Danny HOBBS, individually and as Administrator of the
Chemworld Corporation Agreement Plan, Defendant-Appellee.
 No. 95-15863.
 United States Court of Appeals,
Ninth Circuit.
 Submitted Aug. 15, 1996.*
Decided Oct. 29, 1996.
 
 William J. Hooy, Concord, CA, for plaintiff-appellant.
 Danny G. Hobbs, Kelseyville, CA, in propria persona for defendant-appellee.
 Appeal from the United States District Court for the Northern District of California, Eugene F. Lynch, District Judge, Presiding. D.C. No. CV-93-00316-EFL.
 Before: SNEED, JOHN T. NOONAN, Jr., and THOMPSON, Circuit Judges.
 DAVID R. THOMPSON, Circuit Judge:
 
 
 1
 William Duggan entered into a severance agreement with his employer, Chemworld Corporation (the Agreement), under which he was to receive retirement benefits for life. When Chemworld terminated payments due under the Agreement, Duggan sued Chemworld and its President, Danny G. Hobbs, for breach of contract and for violations of the Employee Retirement Income Security Act of 1974 (ERISA).
 
 
 2
 The district court dismissed the breach of contract claim on the ground that it was preempted by ERISA. After a bench trial on the ERISA claims, the district court entered judgment in favor of Duggan and against Chemworld for (1) benefits due under the Agreement, (2) the present value of future benefits, and (3) attorney fees. The court held that Hobbs, as plan administrator, was not personally liable to Duggan for breaches of ERISA fiduciary obligations because the Agreement constituted a "top-hat" plan and was, therefore, exempt from the fiduciary responsibility provisions of ERISA. See 29 U.S.C. § 1101(a)(1).
 
 
 3
 On appeal, Duggan contends the Agreement is not a top-hat plan. He contends it did not defer compensation for a select group of highly compensated employees within the meaning of section 1101(a)(1). He also argues the district court erred by failing to make a finding as to whether the identities of Hobbs and Chemworld were sufficiently identical to "pierce the corporate veil" and hold Hobbs personally liable for Chemworld's obligations to Duggan. Finally, Duggan seeks attorney fees on appeal.
 
 
 4
 We have jurisdiction under 28 U.S.C. § 1291. We affirm the district court's judgment and deny Duggan's request for attorney fees.
 
 FACTS
 
 5
 Hobbs was president and one of three directors of Chemworld Corp., a closely held corporation in the business of selling janitorial products and restroom sanitation services. He worked full time in the business and supervised its day-to-day operations. He and his family owned a controlling share of the company.
 
 
 6
 Duggan worked as a salesman for Chemworld from 1975 to 1983. In 1980, Duggan and Chemworld entered into a "Sales Representative Agreement" which provided that Duggan would receive initial and residual commissions on accounts he obtained. The agreement did not provide explicitly for continued residual commissions after termination or retirement.
 
 
 7
 Three years later, a dispute arose between Hobbs and Duggan over the computation of Duggan's commissions and whether Duggan's four-day work week satisfied the hours requirement of the Sales Representative Agreement. The dispute heated up when Hobbs demanded that Duggan either accept a new commission structure or be terminated. Both parties obtained counsel and attempted to negotiate a resolution. Unable to find a mutually satisfactory employment arrangement, the parties entered into the Agreement, a written severance agreement dated April 22, 1983.
 
 
 8
 Under the Agreement, Duggan agreed to retire two days later, and Chemworld agreed to pay him $1,056.88 per month for life in retirement benefits and up to $300 per month for life in health insurance benefits. According to the Agreement, these benefits were to be paid to Duggan in consideration for Duggan's (1) years of loyal service, (2) waiver of all claims to any commissions and bonuses he was entitled to receive under previous agreements with Chemworld, (3) waiver of all causes of action against Chemworld, and (4) agreement not to compete with Chemworld in specified locations.
 
 
 9
 Duggan sought Chemworld's commitment to set aside funds to insure payment of his benefits, but no agreement was ever reached on this point and no funds were ever set aside. Instead, Chemworld drew money from its general account to pay Duggan's benefits under the Agreement.
 
 
 10
 Chemworld made the required payments to Duggan and his health insurance company for approximately nine years. In 1992, Chemworld ran into financial difficulties and stopped making the payments. Eventually Chemworld became insolvent.
 
 
 11
 Duggan is the only employee ever to have received retirement benefits from Chemworld. During Duggan's last year at Chemworld, he was one of approximately 23 full-time employees. The average employee salary at Chemworld was less than $12,000 per year. Duggan, however, was Chemworld's top salesman and was earning between $50,000 and $60,000 a year from his sales commissions and residuals. He was the highest paid nonowner employee at Chemworld; he earned almost twice as much as the next highest paid employee.
 
 
 12
 Duggan brought this action against Chemworld and against Hobbs, individually. The district court ruled against Chemworld and ordered it to pay Duggan the amounts due under the Agreement, the present value of future benefits and attorney fees. On Duggan's claim against Hobbs individually, the district court ruled in favor of Hobbs. The court concluded that the Agreement was a top-hat plan under 29 U.S.C. § 1101(a)(1), it was exempt from ERISA's fiduciary responsibility requirements, and as a result Hobbs had no personal liability to Duggan. Duggan appeals the district court's judgment in favor of Hobbs.
 
 DISCUSSION
 
 13
 * Duggan first challenges the district court's determination that his severance Agreement with Chemworld constituted a top-hat plan under § 1101(a)(1).
 
 
 14
 ERISA, 29 U.S.C. §§ 1001, et seq., is a comprehensive statute that subjects a wide variety of employee benefit plans to complex and far-reaching rules designed to protect the integrity of those plans and the expectations of their participants and beneficiaries. See Scott v. Gulf Oil Corp., 754 F.2d 1499, 1501 (9th Cir.1985). Neither party disputes the district court's determination that the Duggan-Chemworld Agreement is a "plan" covered by ERISA.
 
 
 15
 The key issue is whether the Duggan-Chemworld Agreement qualifies as what is commonly called a "top-hat" plan under 29 U.S.C. § 1101(a)(1). Hobbs's individual liability under ERISA depends on this determination because ERISA exempts top-hat plans from the fiduciary, funding, participation and vesting requirements applicable to other employee benefit plans. See 29 U.S.C. § 1101(a)(1) (exemption from fiduciary responsibilities); section 1081(a)(3) (exemption from minimum funding standards); section 1051(2) (exemption from participation and vesting requirements). See also Pane v. RCA Corp., 868 F.2d 631, 637 (3rd Cir.1989). If the Agreement qualifies as a top-hat plan, Hobbs is exempt from the fiduciary duties ERISA imposes on plan administrators and he cannot be held personally liable for their breach.
 
 
 16
 A top-hat plan is defined in ERISA as "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. 1101(a)(1).
 
 
 17
 There is no dispute that the Plan is unfunded. Rather, the parties dispute whether, within the meaning of section 1101(a)(1), the plan provides "deferred compensation" and whether Duggan qualifies as a "select group of management or highly compensated employees."
 
 
 18
 Duggan contends "deferred compensation" within the meaning of section 1101(a)(1) is limited to the typical deferred compensation plan under which an employee, prior to "earning" certain compensation, elects to defer the receipt of that compensation until at least one calendar year after he renders the services for which he is being compensated. Such plans allow employees to defer income tax liability, thus benefitting from lower income tax rates during retirement. The severance payments provided under the Duggan-Chemworld Agreement are not deferred compensation in Duggan's view because the Agreement was not entered into before he rendered the services for which he was to be paid under the Agreement, and the Agreement did not provide for the payment of "earnings" that had been retained by the employer during Duggan's tenure at Chemworld.
 
 
 19
 Hobbs advocates a more expansive view of deferred compensation. He contends that for purposes of section 1101(a)(1), deferred compensation includes retirement payments where, as here, the right to that income derives from a severance agreement rather than from past earnings that have been retained by the employer by prior arrangement for payment at a later date.
 
 
 20
 We have never addressed in this circuit the scope of "deferred compensation" under the top-hat exception of section 1101(a)(1). In analyzing this issue, we consider first the policy underlying the top-hat exception. The Department of Labor has explained:
 
 
 21
 [I]n providing relief for "top hat" plans from the broad remedial provisions of ERISA, Congress recognized that certain individuals, by virtue of their positions or compensation level, have the ability to affect or substantially influence, through negotiation or otherwise, the design and operation of their deferred compensation plan, taking into consideration any risks attendant thereto, and therefore, would not need the substantive rights and protection of Title I.
 
 
 22
 DOL Opin. Letter 90-14A; See also DOL Opin. Letter 92-13A, n. 1.
 
 
 23
 We see no reason to treat a select group of highly paid employees, who have the power to influence the design and operation of their deferred compensation plans, differently from Duggan who had the same power to influence, and did influence, the design and operation of his plan. Duggan hired an attorney to negotiate the Agreement on his behalf and persuaded Chemworld to provide him with lifelong retirement benefits. He was the only employee ever to receive retirement benefits from Chemworld. We conclude the policy behind the top-hat exception supports the broader view that "deferred compensation" includes the retirement payments deriving from Duggan's severance Agreement.
 
 
 24
 Further, although no case has squarely addressed the issue, the Third Circuit has stated that compensation due under a severance agreement is a form of deferred compensation for the purposes of section 1101(a)(1). See Pane v. RCA Corp., 868 F.2d 631, 637 (3rd Cir.1989). In Pane, the court held that severance agreements for executives who were expected to be displaced in a merger were maintained primarily for the purpose of providing deferred compensation to a select group of highly paid employees, under section 1101(a)(1). Id. See also Modzelewski v. Resolution Trust Corp., 14 F.3d 1374, 1377 n. 3 (9th Cir.1994) (suggesting that severance pay might constitute deferred compensation for the purposes of the top-hat exception).
 
 
 25
 Duggan argues that Pane is distinguishable because the executives in Pane were expected to work for several months before their anticipated terminations, whereas Duggan was to retire two days after entering into his severance Agreement. We reject this argument. ERISA does not treat severance compensation differently depending on how long the employee works after the agreement is signed.
 
 
 26
 The payments due to Duggan under the Agreement are deferred compensation because they provide compensation for services substantially after the services were rendered. According to the Agreement, the severance payments were partially "in consideration for [Duggan's] years of dedicated service [and] loyalty to the company." Chemworld was providing Duggan deferred compensation (monthly payments for life) for his past services and loyalty.
 
 
 27
 Duggan also waived any claims he may have had to residual commissions. Any residual commissions to which he may have been entitled also derived from Duggan's past service. Finally, Duggan could have sought a lump sum payment in exchange for his waiver of all claims and his retirement, but instead he agreed to accept deferred payments and receive them incrementally over his lifetime. We conclude the payments owed under the Agreement constitute deferred compensation for the purposes of section 1101(a)(1).
 
 
 28
 The fact that Duggan and Chemworld entered into the Agreement after Duggan had already provided some of the services for which he was being compensated does not change our view that the Agreement provides for deferred compensation. The compensation was deferred because Duggan did not receive it until well after he rendered most of the services for which he was being compensated.[1] As one treatise explains,
 
 
 29
 Deferred compensation arrangements are generally established either before or at the time of the performance of service to which the compensation relates. Certain arrangements, especially those that provide supplemental retirement income benefits, can be adopted after the service has been rendered.
 
 
 30
 Andrew J. Lawlor and Jeffrey Perlmuter, "Nonqualified Deferred Compensation for Key Executives," in Employee Benefits Handbook, § 14.01 (Jeffrey D. Mamorsky ed., 3rd ed. 1991) (emphasis added).
 
 
 31
 Contrary to Duggan's contentions, Department of Treasury regulations promulgated under the Internal Revenue Code are consistent with this view. Temporary Treasury Regulation Section 1.404(b)-1T pertains to the deductibility of employer contributions to arrangements "deferring the receipt of ... compensation." It provides:
 
 
 32
 A-2: (a) For purposes of section 404(a), (b) and (d), a plan, or method or arrangement, defers the receipt of compensation or benefits to the extent it is one under which an employee receives compensation or benefits more than a brief period of time after the end of the employer's taxable year in which the services creating the right to such compensation or benefits are performed....
 
 
 33
 (b) A plan, or method or arrangement, shall be presumed to be one deferring the receipt of compensation for more than a brief period of time after the end of an employer's taxable year to the extent that compensation is received after the 15th day of the 3rd calendar month after the end of the employer's taxable year in which the related services are rendered ("the 2-1/2 month period")....
 
 
 34
 Temporary Treas.Reg. § 1.404(b)-1T. According to this regulation, compensation is deferred when it is received by the employee significantly after the services are rendered. Nothing in the regulation requires an employee to arrange the deferral prior to rendering the services for which he is being compensated.
 
 
 35
 An adopted Treasury Regulation also suggests that prior arrangement is not required. See 26 C.F.R. § 1.404(a)-1. It explains that employer deductions for contributions to "deferred payment plans" may not exceed a reasonable allowance for services provided. It goes on to explain that
 
 
 36
 ... Among the elements to be considered in determining [what constitutes a reasonable allowance] are the personal services actually rendered in prior years as well as the current year and all compensation and contributions paid to or for such employee in prior years as well as in the current year. Thus, a contribution which is in the nature of additional compensation for services performed in prior years may be deductible ....
 
 
 37
 26 C.F.R. § 1.404(a)-1 (emphasis added). This regulation also suggests that deferred compensation plans may provide additional compensation for services already rendered. Thus, we reject Duggan's contention that deferred compensation includes only arrangements where the agreement to defer is made prior to the time the services are rendered.
 
 
 38
 We next consider Duggan's contention that his retirement arrangement under the Agreement did not cover a "select group" of highly compensated employees.
 
 
 39
 To qualify as a top-hat plan under ERISA, a deferred compensation arrangement must be maintained for a "select group of management or highly compensated employees." § 1101(a)(1). Duggan does not challenge the district court's conclusion that he was highly compensated. Rather, he contends that he was not a "select group" of highly compensated employees because he was unable to influence the design and operation of the plan. We disagree.
 
 
 40
 Although we have never decided the issue, other courts have concluded that employees are part of a "select group" under section 1101(a)(1) where the employer's retirement-plan coverage is limited to a small percentage of the employer's entire work force. See, e.g., Darden v. Nationwide Mut. Ins. Co., 796 F.2d 701, 708 (4th Cir.1986); Darden v. Nationwide Mut. Ins. Co., 717 F.Supp. 388, 397 (E.D.N.C.1989) (holding that a plan did not cover a select group where 18.4% of the work force was covered), aff'd, 922 F.2d 203 (4th Cir.1991), rev'd on other grounds, 503 U.S. 318, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992); Pane v. RCA Corp., 868 F.2d 631, 637 (3d Cir.1989) (holding that a plan covered a select group where less than one-tenth of one percent of the work force was covered); Belka v. Rowe Furniture Corp., 571 F.Supp. 1249, 1251 (D.C.Md.1983) (holding that a plan covered a select group where 4.6% of the work force was covered by the agreement); DOL Op. Letter 75-64 (Aug. 1, 1975) (holding that a plan covered a select group where 4% of active employees were covered).
 
 
 41
 Here, Duggan was the only employee covered by the severance Agreement. No other Chemworld employee was covered by any retirement plan. During his last year of work, Duggan was one of 23 employees at Chemworld, constituting less than 5% of the work force. Numerically, Duggan qualifies as a "select group" of employees.
 
 
 42
 But the "select group" requirement includes more than a mere statistical analysis. The Department of Labor has explained that the top-hat exception was intended to apply to employees who
 
 
 43
 by virtue of their position or compensation level, have the ability to affect or substantially influence, through negotiation or otherwise, the design and operation of their deferred compensation plan....
 
 
 44
 DOL Opin. Letter 90-14A. As previously stated, Duggan exerted influence over the design and operation of his severance Agreement through his attorney and his negotiations with Hobbs. He exerted sufficient influence to become the only employee ever to receive retirement benefits from Chemworld. Accordingly, we conclude that Duggan's severance Agreement was maintained for a "select group" within the meaning of section 1101(a)(1).
 
 
 45
 In sum, we hold that Duggan's severance Agreement was maintained primarily for the purpose of providing deferred compensation to a select group of employees within the meaning of section 1101(a)(1). The plan is exempt from the ERISA fiduciary responsibilities set out in sections 1101-1114.
 
 II
 
 46
 Duggan next contends the district court erred by failing to address the issue whether Hobbs and Chemworld share such an identity of interests that Hobbs should be personally liable for Chemworld's obligations. We hold the district court did not err by failing to make findings on this issue.
 
 
 47
 Duggan's allegation in his complaint that Chemworld was the alter ego of Hobbs was contained within his breach of contract claim. The breach of contract claim was dismissed by the district court on the ground that it was preempted by ERISA. Duggan does not appeal that dismissal. Rather, he seeks to amend his pleading under Rule 15(b) of the Federal Rules of Civil Procedure to allege an alter ego theory of liability that was not raised during trial.
 
 
 48
 Generally, we will not consider an issue raised for the first time on appeal. Whittaker Corp. v. Execuair Corp., 953 F.2d 510, 515 (9th Cir.1992). We have recognized only three exceptions to this general rule: (1) when review is necessary in an exceptional case to prevent a miscarriage of justice or to preserve the integrity of the judicial process; (2) when a new issue arises due to a change in law while the appeal is pending; (3) when the issue presented is purely one of law and either does not depend on the factual record developed in the trial court, or the pertinent record has been fully developed. Bolker v. C.I.R., 760 F.2d 1039, 1042 (9th Cir.1985). If one of these exceptions applies, we have the discretion to consider the issue. Id.
 
 
 49
 None of these exceptions applies. This case is not an "exceptional" case requiring us to allow Duggan to amend his pleading to prevent a miscarriage of justice or preserve the integrity of the judicial process. Nor did any new law applicable to this case arise during this appeal. Finally, the determination whether Chemworld is the alter ego of Hobbs is a question of fact, not law. See Wolfe v. United States, 798 F.2d 1241, 1243 n. 2 (9th Cir.1986), modified on other grounds, 806 F.2d 1410 (9th Cir.1986), cert. denied, 482 U.S. 927, 107 S.Ct. 3210, 96 L.Ed.2d 697 (1987); see also Towe Antique Ford Found. v. I.R.S., 999 F.2d 1387, 1391 (9th Cir.1993). And that question has not been resolved.
 
 
 50
 The alter ego issue was not tried in the district court even by implication. Any testimony pertinent to the alter ego issue was introduced to persuade the court on the four issues that were before it during trial: (1) whether the severance agreement was a "top-hat" plan, (2) whether Hobbs was the administrator of the plan, (3) whether Hobbs was a fiduciary under the plan, and (4) whether Hobbs violated any fiduciary duties. See Order Denying Defendant's Motion to Dismiss ... (July 14, 1993). Because the alter ego issue was not tried, Hobbs presented no evidence on the issue, or at least not the evidence he might have presented had he known the issue was to be decided. As a result, Hobbs would be substantially prejudiced if we were to decide the issue on the incomplete record before us. See Consol. Data Terminals v. Applied Digital Data Sys. Inc., 708 F.2d 385, 396 (9th Cir.1983) ("late pleading amendments are improper under [Rule 15(b) ] if they cause substantial prejudice to the opposing party.").
 
 
 51
 Duggan's reliance on Brandon v. Holt, 469 U.S. 464, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985), is misplaced. In that case, the Court in essence amended the pleadings to hear an issue of law. Here, Duggan seeks a factual determination. In Brandon, the record was fully developed and the opposing party was not prejudiced by the amendment. Here, the record is incomplete and Hobbs would be substantially prejudiced by the requested amendment.
 
 
 52
 In short, the district court failed to make a finding on the alter ego issue because Duggan failed to raise that issue in pretrial briefs, during the trial, or in post-trial briefs. He could have sought to amend his pleadings at any time during the district court proceedings, but he did not. He waived the alter ego claim in the district court and we will not consider it on appeal.
 
 III
 
 53
 Duggan seeks his attorney fees on appeal under 29 U.S.C. § 1132(g)(1). This ERISA section "allows for the recovery of attorney fees and costs incurred in an appeal regardless of the outcome." Oster v. Barco of Cal. Employees' Retirement Plan, 869 F.2d 1215, 1221 (9th Cir.1988); see also Watkins v. Westinghouse Hanford Co., 12 F.3d 1517, 1528 (9th Cir.1994). It is within the court's discretion to award attorney fees. Hummell v. S.E. Rykoff & Co., 634 F.2d 446 (9th Cir.1980). The factors to be considered in exercising this discretion are:
 
 
 54
 (1) the degree of the opposing party's culpability or bad faith; (2) the ability of the opposing party to satisfy an award of fees; (3) whether an award of fees against the opposing party would deter others from acting under similar circumstances; (4) whether the party requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative legal merits of the parties' positions.
 
 
 55
 Id. at 453. No one of these factors is necessarily decisive. Paddack v. Morris, 783 F.2d 844, 846 (9th Cir.1986).
 
 
 56
 Applying the Hummell factors, we conclude that Duggan is not entitled to attorney fees on appeal. First, Hobbs does not appear to have a high degree of culpability or bad faith. He was not required to personally fund the plan and he faithfully disbursed Duggan's benefits until Chemworld no longer had enough money to make the payments. Second, the record indicates that Hobbs has limited personal resources with which to satisfy a judgment of attorney fees. The parties stipulated that Hobbs has no assets other than a limited partnership which holds the house in which he and his family are currently living. Third, an award of attorney fees would not deter similar conduct because Chemworld only ceased payments when it was on the verge of insolvency. As to the fifth factor, the relative legal merits of the parties' positions favors Hobbs.
 
 
 57
 Only the fourth Hummell factor weighs in Duggan's favor. Although Duggan brought this suit to benefit himself, the interpretations of "deferred compensation" and "select group" under section 1101(a)(1) raised issues of first impression in this circuit. This factor, however, does not outweigh the others.
 
 
 58
 We reject Duggan's request for attorney fees on appeal.
 
 CONCLUSION
 
 59
 We hold that the Duggan-Chemworld severance Agreement fits within the top-hat exception of 29 U.S.C. § 1101(a)(1) and as such is not subject to ERISA's fiduciary obligations. Hobbs is not personally liable to Duggan under ERISA. The district court did not err by failing to make a finding as to whether Chemworld was the alter ego of Hobbs. Finally, we reject Duggan's request for attorney fees.
 
 
 60
 AFFIRMED.
 
 
 
 *
 The panel unanimously finds this case suitable for disposition without oral argument. Fed.R.App.P. 34(a); 9th Cir.R. 34-4
 
 
 [1]
 To the extent that the retirement payments were in exchange for Duggan's agreement not to compete with Chemworld in certain locations, the payments seem to be in exchange for ongoing rather than past services. But a top-hat plan need only be "primarily" for the purpose of providing deferred compensation, not exclusively for that purpose. See § 1101(a)(1)