Doug CAGLE, Adrian A. deVogel, Stuart Appelbaum, Don Hopkins, Henry Jenkins, and Lenore Miller, as Trustees and Fiduciaries of the Retail, Wholesale and Department Store International Union and Industry Health and Benefit Fund, Plaintiffs,

v.

Lannie D. FORD, William W. Phipps and Soles, Phipps, Ray, Prince & Williford, Attorneys at Law, Defendants.

No. 7:98–CV–70–F(1).

United States District Court,
E.D. North Carolina,
Southern Division.

April 22, 1999.

Martha A. Geer, Patterson, Harkavy & Lawrence, Raleigh, NC, Lisa Grafstein, Raleigh, NC, for plaintiffs.

Clay A. Collier, Crossley, McIntosh, Prior & Collier, Wilmington, NC, for defendants.

## ORDER

FOX, District Judge.

This matter is before the court on the cross-motions for summary judgment filed by the Plaintiffs and the Defendants in this matter. The Plaintiffs have responded to the Defendants's motion for summary judgment. The Defendants did not respond to the Plaintiffs' motion. Both motions are ripe for disposition.

### I.

The Plaintiffs, Trustees of the Retail, Wholesale and Department Store International Union and Industry Health and Benefit Fund (hereinafter the "Trustees" and the "Fund," respectively) filed this action on April 27, 1998, seeking a declaratory judgment requiring the Defendants, a Fund participant and his attorneys, to pay money to the Fund pursuant to a subrogation policy in the Fund's Rules and Regulations (hereinafter "the Plan"). The Fund is an employee welfare benefit plan as defined in 29 U.S.C. § 1002(1) of the *Employee Retirement Income Security Act of 1974* ("ERISA"), 29 U.S.C. §§ 1001–1461. The Fund, which is self-funded, provides health and welfare benefits to covered employees, retirees, and their dependents through contributions made by employers pursuant to a collective bargaining agreement. The Fund is operated pursuant to an Agreement and Declaration of Trust ("the Trust Agreement"). Three of the Trustees of the Fund are appointed by the participating Employers and three are appointed by the Union. The Fund is self-administered by an Administrator, Mr. Michael Tamucci, appointed by the Trustees. The Defendant, Lannie D. Ford, is an employee and "participant" in the Fund as

defined by subsection 3(7) of 29 U.S.C. § 1002. The Defendants William W. Phipps and the law firm of Soles, Phipps, Ray, Prince & Williford, are Ford's attorneys.

### II. Summary Judgment Standard

As an initial matter, the court notes the settled standard and shifting burdens governing the disposition of a motion for summary judgment. *See Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.), *cert. denied,* 513 U.S. 813, 115 S.Ct. 67, 130 L.Ed.2d 24 (1994). Summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party seeking summary judgment bears the burden initially of coming forward and demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its burden, the non-moving party then must come forward and demonstrate that such a fact issue does indeed exist. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Summary judgment is appropriate against a party who fails to make a showing sufficient to establish any one of the essential elements of the party's claim on which he will bear the burden of proof at trial. *See Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548. In this case, because the court perceives that no genuine issues of material fact exist that remain to be tried, the court will enter judgment as a matter of law.

### III. Appropriate Standard of Review

In reviewing a decision by the trustees or administrators of an ERISA plan, a court first must determine what standard of review is appropriate. The ERISA statute is silent on the subject. In *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Supreme Court held that decisions of plan administrators and trustees are "to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115, 109 S.Ct. 948. If the plan gives the administrator or trustee such discretionary authority, then a district court must review a decision only for abuse of discretion. *See Sheppard & Enoch Pratt Hosp. v. Travelers Ins. Co.,* 32 F.3d 120, 123–24 (4th Cir.1994) (quoting *de Nobel v. Vitro Corp.,* 885 F.2d 1180, 1186 (4th Cir.1989)). Under the abuse of discretion standard, a decision must be upheld if it is "reasonable." *Brogan v. Holland,* 105 F.3d 158, 161 (4th Cir.1997). The decision is reasonable if it is the "result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Id.*

Recent Fourth Circuit opinions have articulated a third, "heightened" abuse of discretion standard applicable if a plan administrator or fiduciary acts under a conflict of interest when making a plan decision. Generally, a conflict of interest arises when "an administrator['s] decision ... impacts its own financial interests." *Bernstein v. CapitalCare, Inc.,* 70 F.3d 783, 787 (4th Cir.1995). If a plan administrator with discretionary powers acts under a conflict of interest, "that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" *Bruch,* 489 U.S. at 115, 109 S.Ct. 948 (citation omitted). The Fourth Circuit has explained that the standard of review in a conflict case is a "less deferential" one than the abuse of discretion standard, *Jenkins v. Montgomery Industries, Inc.,* 77 F.3d 740, 742 (4th Cir.1996). That is, "the fiduciary decision will be entitled to some deference, but this deference will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict." *Doe v. Group Hospitalization & Medical Services,* 3 F.3d 80, 87 (4th Cir.

1993); *see also Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228, 233 (4th Cir.1997) ("The more incentive for the administrator or fiduciary to benefit itself by a certain interpretation of benefit eligibility or other plan terms, the more objectively reasonable the ... decision must be and the more substantial the evidence must be to support it.").

█ In this case, the Trust Agreement grants the Trustees discretionary authority " 'to determine eligibility requirements and to adopt Rules and Regulations setting forth same which shall be binding on the Employees, their families and dependents.' " Plaintiff's Memorandum, at 3 (quoting Art. VI, Sec. 4 of the Trust Agreement, Exhibit A to Tamucci's Affidavit). Thus, the Trustees's interpretation of the Plan's subrogation provision is entitled to some deference. However, because certain of the Trustees serve as both employers and fiduciaries retaining a financial interest in reducing payments under the Plan, the Trustees's decisions are judicially reviewed under a "heightened" or less deferential abuse of discretion standard. *See Jenkins*, 77 F.3d at 742.

## IV. Discussion

On May 6, 1995, the Defendant Ford sustained serious injuries when the motorcycle he was driving was hit by a car driven by Johnny Mack Strickland. Ford subsequently received medical treatment for his injuries. On May 12, 1995, Ford contracted with the Defendant Phipps and his law firm to represent him for the purposes of making a claim against Strickland for his personal injuries and medical expenses. Ford, as a beneficiary of the Fund, made application for benefits, specifically the payment of his medical bills and sick pay benefits.

Article VII of the Plan, labeled "Subrogation," effective at the time of Ford's accident, states in relevant part:

> If an Employee or one of his Dependents ... should receive benefits from the Plan for Injuries caused by someone else (such as an automobile accident), the Plan, through subrogation, has the right to seek repayment from the other party or his insurance company, or in the event an Employee or his Dependent recovers the amount of medical expense paid by the Plan by suit, settlement or otherwise from any third person or his insurer, the Plan has the right to be reimbursed through Subrogation.

Plaintiff's Memorandum, at Exhibit B to Tamucci Affidavit, at 44.

On August 22, 1995, Ford received correspondence from the Fund stating the following:

> ... the Board of Trustees has adopted a policy requiring a third person who has caused you to incur medical expense to reimburse the Benefit Fun for the medical costs which it paid on your behalf.
>
> The Benefit Fund is not interested in depriving you of any rights you may have against such a third party and it is prepared to cooperate with you and any attorney you may retain in enforcing your claim.
>
> However, it is necessary to carry out the rules of your Plan of Benefits, and we request that you execute and return the enclosed Subrogation Agreement and Accident Report in the envelope provided for your convenience. Upon receipt of the executed Subrogation Agreement and Accident Report, the Fund will process your claim for payment.
>
> Obviously, if it should develop that you have no claim against a third person, or that the claim cannot be enforced against the third party, for any reason, no effort will be made to seek reimbursement from you.

Plaintiff's Memorandum, at Exhibit C to Tamucci Affidavit. This letter from the Fund was accompanied by a questionnaire that requested information concerning, among other things, whether Ford had retained an attorney. The letter also was accompanied by a "Subrogation Agree-

ment" (hereinafter "the Agreement"). The Agreement stated:

I(we) understand that if payments are made under the Plan for any treatment or services because of injury to, or sickness of, an eligible individual who has a lawful claim, demand or right against a third party or parties (including an insurance carrier) for indemnification, damages or other payment with respect to such injury or sickness, I (we) am (are) required to subrogate to the [Fund/Plan], to the extent of payment made under said Plan, my (our) rights to receive or claim such indemnification, damages or other payment.

In consideration thereof, if payments are made under said Plan for treatment or service on account of the same injury or sickness and to the extent of such payments made (but not in excess of the proceeds of any recovery),

(a) I (we) agree to reimburse the Plan in full from the proceeds of any recovery received by me (us) because of such injury or sickness, and

(b) The Plan shall be subrogated in full to my (our) rights to such recovery and my (our) interest in the proceeds of such recovery;

if such recovery is based upon the eligible individual's lawful claim, demand or right against a third party or parties (including an insurance carrier).

Plaintiff's Memorandum, at Exhibit D to Tamucci Affidavit. On August 28, 1995, Ford *and* his attorney, Phipps, signed the above Agreement and returned it to the Fund. Ford also returned the questionnaire accompanying the Agreement in which he informed the Fund that he had hired Phipps as his attorney. On August 30, 1995, Defendant Phipps wrote a letter to the Fund advising the Fund of his representation of Ford. After Ford and Phipps returned this information to the Fund, the Fund began processing Ford's claims. Ultimately, the Fund paid $36,917.26 for Ford's medical claims and $4,802.19 for sick pay, totalling $41,719.45.

From May 12, 1995, until November, 1995, the Defendants Phipps and his firm investigated and negotiated Ford's personal injury claim against Strickland. By November, Phipps and Ford determined that Ford's recovery was limited to $25,000—the policy limit of a liability insurance policy owned by Strickland. On November 8, 1995, Phipps wrote to the Fund's attorney, Mr. Clyde Riley, to inform the Fund of the limited recovery available to Ford. On January 16, 1996, Riley wrote Strickland's insurance carrier to "put [the carrier] on notice of the Fund's subrogation claim" Plaintiff's Memorandum, at Exhibit F of Tamucci Affidavit. On December 2, 1996, the liability insurance carrier for Strickland tendered the policy limit of $25,000 to the Defendant Ford.

In January 1997, Phipps informed Riley that Ford had received a check from Strickland's insurer in the amount of $25,000.00. After acknowledging the Fund's right to subrogation, Phipps offered to send the Fund $14,402.59 of the $25,000.00. Phipps explained that that figure represented the total recovery less 25% of that amount—$6,250.00—constituting his attorneys' fees and less $145.73 in the firm's out-of-pocket costs. Phipps stated that he also would withhold $4,201.68 to pay other medical expenses incurred by Ford that the Fund had not yet paid. In a letter dated, August 19, 1997, the Fund declined Phipps's offer. On that same day, Phipps wrote Tamucci, the Plan Administrator, and enclosed a check for $18,604.27 representing the $25,000.00 less his $6,250.00 in fees and $145.73 in costs. The Fund did not negotiate the check and instead filed this action. The Complaint seeks a declaratory judgment that Ford, Phipps and Phipps's law firm must reimburse the Fund in the full amount of recovery of $25,000, or a declaratory judgment that the Fund is entitled to a constructive trust over the $25,000 paid to Ford and held in trust by Phipps and his law firm.

## A. Medical Benefits Denied.

■ Before turning to the thrust of the parties's motions for summary judgment, one aspect of the Defendants's answer and the parties's summary judgment memoranda bears mention. The court has reviewed the Defendants's answer, and notes, as did the Supreme Court in a different context, "in a world of silk purses and pigs' ears, [the Defendants's answer] is not a silk purse of the art of [ ] drafting." *Lindh v. Murphy*, 521 U.S. 320, 336, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). For example, the Defendants designate two claims (one for a "constructive trust" under federal common law and one seeking a declaratory judgment *in their favor*) as "Defenses" to the Plaintiff's claim. Indeed, the Defendants's answer contains a prayer for relief. *See* Answer, at 17–18. The Defendants did not properly designate their "claims" as counterclaims pursuant to FED.R.CIV.P. 13,[1] and the Plaintiffs have not filed a responsive pleading to those "claims." Part of Defendants's "prayer for relief" seeks a declaratory judgment that "the defendant Ford recover at least the amount of $4,201.68 as reimbursement for outstanding medical bills which are unpaid by the Fund." Answer, at 17, ¶ 3. Indeed, in the parties's memoranda in support of their motions for summary judgment, the parties discuss whether Ford should be paid $4,201.68 by the Fund for his outstanding medical bills.

The court perceives that any claim Ford makes against the Fund for his outstanding medical bills must be presented properly to the court as a claim for denial of health care benefits by a welfare benefit plan governed by ERISA. As such a claim has not been presented properly to the court, the Defendants's request for "summary judgment" on such a claim hereby is DENIED.

## B. Reimbursement

Plaintiffs request a declaratory judgment that Ford, his attorney Phipps, and Phipps's law firm are obligated under the subrogation clause in the Plan and the Agreement signed by Ford and Phipps in August, 1995, to reimburse the Fund the full $25,000 that Ford recovered from Strickland's insurance carrier. The Defendants argue that the Plaintiffs should be estopped from seeking reimbursement for the full $25,000 because had Ford not retained Phipps and his firm to pursue Ford's claim against Strickland, the Fund would not have recovered any of the benefits paid. In essence, the Defendants argue that federal common law should prevent the Fund from profiting from its inaction by relying on the work of Phipps and his firm instead of exercising its right of subrogation to pursue the claim itself.

As an initial matter, the court notes that the parties have used the terms "subrogation" and "reimbursement" interchangeably. However, the terms have distinct and different meanings. As another court has explained:

> Subrogation clauses are a common feature of ERISA plans. While they vary widely in precise operation and effect, they share the goal of limiting the total expenditure of plan assets. Subrogation accomplishes this by permitting the plan to "stand in the shoes" of the beneficiary with respect to tort or other recoveries to which the beneficiary is entitled on account of the injuries for which the plan has paid benefits. This prevents the beneficiary from recovering twice-once from the plan, and once from the tortfeasor.... Subrogation is frequently confused with reimbursement, owing perhaps to the frequency with which both provisions are included in ERISA plans. The key distinction is that subrogation in effect assigns (or requires assignment of) the tort claim to the subrogee (the plan). Reimbursement simply

---

1. The court expresses no opinion whether such "claims" would be considered "compulsory counterclaims" or "permissive counterclaims." *See* FED.R.CIV.P. 13(a), (b).

requires the successful owner of the tort claim (the beneficiary) to repay the plan's advances. Despite this, it is common for plaintiffs to assert claims against tortfeasors which are ostensibly subrogated elsewhere, and fight over allocation afterwards.

*Waller v. Hormel Foods,* 950 F.Supp. 941, 944 (D.Minn.1996). Indeed, that is what the parties have done in this matter. The Plaintiffs are seeking *reimbursement,* for medical benefits paid, from a third-party recovery that the Defendant Ford and his attorneys obtained on their own.

Regarding Defendants's argument that the court should apply equitable principles from federal common law to override the Plan and Agreement, the court notes that in enacting ERISA, Congress intended for the judiciary to develop a body of federal common law to supplement the statute's express provisions. *See Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987). However, this lawmaking authority is limited to situations in which it is "necessary to fill in interstitially or otherwise effectuate the [ERISA] statutory pattern enacted in the large by Congress." *Bollman Hat Co. v. Root,* 112 F.3d 113, 118 (3d Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 373, 139 L.Ed.2d 290 (1997) (quotation and citation omitted); *see Jenkins,* 77 F.3d at 743 (noting that the federal common law of rights and obligations under ERISA-regulated plans exists merely to fill in the statute's gaps). As the Court of Appeals for the Fourth Circuit has explained, "[c]ourts should fashion federal common law only when 'necessary to effectuate the purposes of ERISA.'" *United McGill Corp. v. Stinnett,* 154 F.3d 168, 171 (4th Cir.1998) (quoting *Singer v. Black & Decker Corp.,* 964 F.2d 1449, 1452 (4th Cir.1992) (citations omitted)). In reviewing ERISA-related disputes,

> [r]esort to federal common law generally is inappropriate when its application would conflict with the statutory provisions of ERISA, discourage employers

from implementing plans governed by ERISA, or threaten to override the explicit terms of an established ERISA benefit plan. And, courts should remain circumspect to utilize federal common law to address issues that bear at most a tangential relationship to the purposes of ERISA.

*Id.* (citations omitted).

 ERISA does not mandate any minimum substantive content for employee welfare benefit plans. *See Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 91, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983); *Hamilton v. Air Jamaica, Ltd.,* 945 F.2d 74, 78 (3d Cir.1991). Instead, one of the primary functions of ERISA is to ensure the integrity of written, bargained-for benefit plans. *See Duggan v. Hobbs,* 99 F.3d 307, 309–10 (9th Cir.1996); *Van Orman v. American Ins. Co.,* 680 F.2d 301, 302 (3d Cir.1982). To satisfy this objective, the plain language of an ERISA plan must be enforced in accordance with "its literal and natural meaning." *Health Cost Controls v. Isbell,* 139 F.3d 1070, 1072 (6th Cir.1997).

Regarding subrogation and reimbursement provisions of employee welfare benefit plans, the Court of Appeals for the Fourth Circuit, in the seminal case on this topic, has stated:

> Where ... the language of the Plan does not qualify the right to reimbursement by reference to the costs associated with recovery, a court is bound to enforce the contractual provisions as drafted. Applying federal common law to override the plan's clear reimbursement provision would contravene, rather than effectuate, the underlying purposes of ERISA. *See Coleman v. Nationwide Life Ins. Co.,* 969 F.2d 54, 58 (4th Cir. 1992) ("Use of estoppel principles to effect a modification of a written employee benefit plan would conflict with ERISA's emphatic preference for written agreements.") (quotation and citation omitted). "The interpretive tool of a growing body of federal common law applicable to ERISA actions is not a

license to rewrite the Plan to the Court's tastes." *Health and Welfare Plan for Employees of REM, Inc. v. Ridler*, 942 F.Supp. 431, 435 (D.Minn. 1996), *aff'd*, 124 F.3d 207, 1997 WL 559745 (8th Cir. Sept.10, 1997) (unpublished).

*Stinnett*, 154 F.3d at 173. Applying this principle, the *Stinnett* court reversed the district court's order requiring a Plan to pay a portion of a beneficiary's attorneys' fees when the beneficiary received a recovery from a third-party tortfeasor.[2]

Unlike the case at bar, the *Stinnett* beneficiary received an award from the third-party tortfeasor in excess of the amount of the medical benefits paid by the Plan even after deducting the beneficiary's attorneys' fees. In a footnote at the end of the *Stinnett* opinion, the Fourth Circuit noted that:

> We leave for another day how to treat situations where the beneficiaries' recovery from the third party after deducting attorney's fees is actually less than the plan's reimbursement claim, thus ostensibly requiring the beneficiary to pay out of her own pocket to meet the plan's claim. *See Bollman*, 112 F.3d at 117 (refusing to address this hypothetical scenario because the third party settlement in that case fully financed both the attorney's fees and the plan's claim). We do note that future disputes over such an anomalous result can easily be avoided by more careful drafting of subrogation and reimbursement provisions. *See Health Cost Controls*, 139 F.3d at 1071 (indicating that plan specified that "in no event will the amount of reimbursement ... exceed ... [t]he amount actually recovered from that part of judgment or settlement in excess of the amount necessary to fully reimburse the

Employee ... for out-of-pocket expenses incurred, including attorney fees"); *Ryan*, 78 F.3d at 125 (reciting that subrogation provision provided that "if the payment you receive from the third party, less your attorneys' fees and other legal expenses, is not enough to reimburse benefit payments at 100%, you must reimburse the plan 100% of what is left after paying your attorneys' fees and other legal expenses").

*Stinnett*, 154 F.3d at 173, n. *. Unfortunately, the Plan at issue in this case was drafted long before the *Stinnett* opinion, and the drafters could not benefit from the Fourth Circuit's advice. Thus, the Plan and the Agreement do not address the effect of the beneficiary's costs of recovery from a third party on the amount of reimbursement.

 Nonetheless, this court is faced with the situation left open by the Fourth Circuit in which the proceeds of the beneficiary's recovery, even without a deduction for the costs of the recovery, are less than the medical benefits paid by the ERISA plan. After much deliberation, this court concludes that the language of the Plan and the Agreement signed by both Ford and his attorney are clear and unambiguous. The Plan itself states "in the event an Employee ... recovers the amount of medical expense paid by the Plan by suit, settlement or otherwise from any third person or his insurer, the Plan has the right to be *reimbursed* through Subrogation." The Agreement states: "I (we) agree *to reimburse the Plan in full* from the proceeds of any recovery received by me (us) because of such injury or sickness." The court perceives that these provisions represent a clear and unambiguous agreement between the Fund and Ford and his attorney that the Plan would be

---

**2.** This court notes that, in their motion for summary judgment, the Defendants cite the vacated district court opinion in *Stinnett* as authority for their argument that this court should apply equitable principles to override the parties's agreement. *See* Defendants's Motion for Summary Judgment, at 5 (noting

that the vacated district court opinion is "strikingly similar to the case at bar"). The court suggests that Defendants's counsel investigate the subsequent history of the cases he cites so that his legal arguments will be of more assistance to the court.

reimbursed *in full* to the extent of a recovery by Ford without regard to the costs of the recovery. Thus, "[a]pplying federal common to override the Plan's reimbursement provision would contravene, rather than effectuate, the underlying purpose of ERISA ... [and its] emphatic preference for written agreements."[3] *Stinnett,* 154 F.3d at 173.

The court notes that the *Stinnett* footnote leaving for another day "situations where the beneficiaries' recovery from the third party *after* deducting attorney's fees is actually less than the plan's reimbursement claim," implies that the attorney in such a case would recover his fees at the expense of the beneficiary. However, the court believes that the Fourth Circuit's comment envisions a case in which the attorney is not a party to the Plan's subrogation/reimbursement agreement. In this case, Ford's attorney, Phipps, signed an agreement that clearly indicates that the Plan would be fully reimbursed to the extent of medical benefits paid without reference to the costs of recovery. Thus, this court perceives that Ford's attorney and his firm are bound by the clear language of that agreement, and thus are not entitled to deduct their contingency fee from the amount of the recovery.

## V. Conclusion

Regardless of how federal common law would apply the equitable doctrine of estoppel to prevent the Fund from benefitting from its inaction in this matter, the court is bound to enforce the clear and unambiguous language of the Plan and Agreement entered into by Ford and his attorneys which requires full reimbursement to the Plan. Thus, the Plaintiffs' motion for summary judgment on their claim for a declaratory judgment that the

Fund is entitled to the full $25,000 that Ford recovered from Strickland hereby is ALLOWED. The Defendants's motion for summary judgment hereby is DENIED. To the extent that either parties's pleadings or motions can be construed as requesting attorneys' fees, the motion is DENIED. The Clerk of Court is DIRECTED to enter judgment accordingly.

SO ORDERED.

---

**3.** The court notes that the interchangeable use of the terms "subrogation" and "reimbursement" by the Plan, the Agreement and the parties initially gave the court pause on the issue of the clarity of the parties's understanding. However, because this misuse happens frequently and because the Plan and Agreement speak in terms of *reimbursing* the Fund after a recovery is obtained by the beneficiary, the court concludes that the written documents and their meaning are clear. Nonetheless, the court encourages the Fund, and other ERISA-regulated plans, to draft their plans and agreements more carefully in the future.